We have one final case for argument, and that is Lian v. D'Amico, and we'll hear argument in that case next. You may proceed. Thank you. I want to clarify the timing. We have split timing on all sides, so understand. Are you Mr. Mammon? Yes, ma'am. And you will take 14 minutes? Yes, ma'am. And then Jean-Claude Andre will take six minutes. And that includes the rebuttal time. So do you have – how do you plan to handle the rebuttal? Your Honor, I'd like to reserve three minutes for rebuttal out of my 14. All right. You may proceed. Thank you, Your Honors, and may it please the Court. I am Nathan Mammon from Kirkland & Ellis, and as indicated, I'll be splitting the argument with Mr. Andre. I will address the state law tort claims that are common to all the appellants, including the due process claim, and then Mr. Andre will address the claims specific to Ms. Chen relating to the charges that were brought against her. Your Honor, this case is, at minimum, about negligence. To be clear, we think it's about much more than negligence, and I'm happy to talk about those issues. But the state's negligence before the dependency hearing and after has destroyed a family and caused incredible damage to an autistic boy, his parents, and his brother. I thought the state Supreme Court said that the initial investigation into whether or not – I'll call it the 72-hour investigation basically is protected, at least up to a gross negligence standard. Is that correct? So – and Your Honor may be referring to some recent letters from – about the Desmet case. Correct. So up to the dependency hearing or the 72-hour hearing, the standard for the negligence or standard for the state's duty, at least for J.L., the autistic boy, is gross negligence. Now that doesn't apply to his brother, who was not removed for any emergency, but for J.L., it's a gross negligence. I guess my question is, what's your strongest claim to establish gross negligence? I mean, you basically have conflicting medical opinions, but there was certainly enough, it seemed to me, in the record to justify the initial decision to remove the minor from the possession of his parents. Well, Your Honor, certainly the evidence that the district court pointed to in initially denying summary judgment, it's found at electronic record page 95, found that there was two things that were really important. That one, Ms. Danner, the investigator didn't – or the social worker didn't obtain the autism records and the care record for the boy and provide those to Dr. Midega, who was the state's chief officer. But we're talking about, Counselor, we're talking about 72 hours. That's not much time to get this case teed up before a King County court commissioner for the initial shelter care hearing. Or I guess it's the seizure hearing. Right. But certainly the doctor that obtained or that was testified for the state about the reason for the boy's malnutrition didn't know about the autism and the comorbidities that would be associated with that. That was key evidence for that. But Your Honor's point, I understand the concern about that limited time for the 72 hours. And that's why I think – I mean, you might have a good negligence argument, but I'm having a difficult time where the investigator relies on – what is it, the scam team at Children's Orthopedic Hospital that basically said, yeah, we've got malnutrition here and it looks like parental neglect. So why wouldn't that establish a basis from which a reasonable investigator could make an initial seizure decision? Well, again, we submit – and I'll answer your question, and then I want to make clear where I think the clear evidence of negligence is. But we would submit that the – even in that 72 hours, the failure to obtain the key medical record and medical evidence, including from Dr. Green, who had been treating this boy for a long time, that that was rise to the level of gross negligence, or a jury can make that determination. But if I can – I mean, part of the problem here is the number of physicians because of the doctor shopping by your client. And, Your Honor, if I may – So which of the 12 doctors is the investigator supposed to go to first when it has to be done in 72 hours? Your Honor, and if I may actually make a point that I think is key, that we're focused on the 72 hours here, but that's not what the negligence claim is limited to. The district court dismissed that. No, I understand that, but it seems to me this is the hardest part of your case, to establish gross negligence as a matter of law. But, Your Honor, if you think that – You might have a much better argument with regard to what happened after the court commissioner authorized the seizure. And we're happy to talk about that, Your Honor, actually, because I think that's very important. Well, I'm still trying to figure out where the gross negligence is. And I guess your answer is, well, she picked the wrong doctor. She should have gone first to some of these other former treatment providers. There was – And then provided that information to the emergency room doc at Children's. Did I understand your argument? Yeah. So the things that happened pre-determinancy hearing that we think rise, that should go to a jury to determine whether it was gross negligence, was that the social worker did not interview the two doctors. But the evidence to support negligence is you didn't go to these doctors first, right? You had a limited amount of time. You couldn't talk to all 12 of them, but you picked the wrong ones. Well, no, I think there was two doctors that are very key to this boy's care. I've been treating this boy for a long time. Well, in a seizure, why can't the investigator rely on what the emergency room physicians and the scan team that is specifically created to address child abuse issues recommends seizing the child? Well, again, it's not just that initial seizure, but it's leading up to the hearing. And so what was the evidence that was obtained during the investigation leading up to the hearing? And we would submit that includes the failure to talk to Dr. Green and Dr. Godabo. The petition actually falsely stated that the mother had interfered with care when the mother was trying to stop administration of Pedialyte, which actually caused damage. How long had it been since the child had been seen by doctors? This is Dr. Green in Portland? It is Dr. Green, yes. Hadn't it been several months? I don't recall the exact date. It may have been August. I thought it was like eight months. I don't recall that exact date. If that's the case, then I'm back to my original question of why is it negligence, gross negligence, not to go to a doctor who hasn't seen this child for eight months when the issue is gross malnutrition? Well, Your Honor, I think because it was not only Dr. Green, but it was Dr. Godabo who had been seeing the boy more recently, and those two were working together. Dr. Green, because he's an organ, recommended that they would have a doctor locally. But, Your Honor, I understand your point about gross negligence. I also want to be clear, though, about the post-hearing conduct because I think that's critical. I've beaten you up enough on this. And I'm happy to answer your questions. I just want to be sure that I get it. No, no, I understand your argument. Because I think that even if you accept that up to the 72 hours that there's an amount of uncertainty that needs to be in the emergency aspect of a 4JL, again, not for the brother, LL, even if you accept that, that ended with the dependency hearing, and there was still the obligation. At that point, you had the time in the world to do a proper investigation. And that was not done. And the evidence is replete that even after that 72-hour hearing, she still did not talk to Dr. Green, still did not provide the right medical reports to Dr. Mitica, did not, you know, made false statements in the petition or the finding that the abuse was founded, made false statements or incorrect statements in that even after that 72-hour emergency hearing. And we think that, you know, the Desmet case that was cited by the parties in recent letters just makes clear that that negligence can be after the hearing as well if it continues the separation. What do we do with the fact that the court commissioner conducted a multi-day hearing when these things usually are done in an hour and heard live testimony from two of the doctors, as well as considering whatever medical records Ms. Danner had been able to gather in that 72-hour period? I think, I mean, you certainly can consider that as a part of the leading up to the 72-hour and the order, but I don't think it has any bearing on what happens after that and the investigation that continues. I'm suggesting, counsel, that because this was an unusually long dependency hearing, that to the extent that there may have been errors in the initial investigation, there was ample opportunity for counsel, for the parents to bring out at the hearing the points that you're making now. And the superior court commissioner, nonetheless, decided to authorize the removal. Correct, at that hearing. Based on the record before the court. Based on the record at that time before the court. But talking about what happened after that hearing, there was information that the hearing officer recognized that Dr. Midega, the state's key doctor, did not have. He, you know, there was evidence of what would happen to the child under, you know, he's no longer in the parent's care. How is the child's health and progression? And the evidence was that there continued to be problems as associated with autism. And it was, you know, I understand the court's, Your Honor, skepticism up to the 72 hours, but I think if you look what happened after that, it's a very unusual case. I mean, usually these things move through, you know, the family court pretty rapidly. And this one had an extended hearing and a pretty comprehensive investigation based on my review of all, I mean, 1,000 document, 1,000 pages of medical records? That's a lot of information. It was certainly extended hearing, complicated by language barrier issues, and there's a lot to go into this, certainly. This was not a typical case. I wouldn't disagree that this is. You think it was a typical case? No, I would not disagree with you. I mean, it is, you know, and overall, I think, Your Honor, this is not a typical case. And I think that's, you know, one of our points, that the way this case was handled both up to the 72-hour hearing, but certainly after, what happened after that hearing, the failure to obtain the evidence that took 10 months before this boy was returned to his family, determined the states dismissed the charges on the dependency, the prosecution was dismissed, and I think, you know, you don't have to accept. There was that, and we just, you know, there's so many claims here that we got a lot of records and we got a lot of claims. Yes, Your Honor. But trying to divide them up. What you're talking about now is what I kind of classified as the prolonged detention? Yes, I think so. For the two negligence claims, which are negligent investigation, and then also the negligent infliction of emotional distress, both of those relate around the prolonged or unreasonable and unnecessary removal of the boy or keeping him away from his parents. So about the infliction of emotional distress, I know there's some evidence about JL. Is there any evidence about LL? There is, Your Honor, about his care by therapists and social workers that he was suffering from. The effects of this was in the investigation how the social workers went to school and called him out at school. There was also evidence, and I don't have it at the tip of my fingers, Your Honor, but where based on a false report that LL had refused to attend school, the state sent police officers to the home and knocked loudly on the door, frightening the mother, frightening the child, LL, as well as to being taken away again. So there is evidence as to his continued harm from this as well. You're down to about a minute and a half for your rebuttal. All right. Thank you, Your Honor. Thank you. Hello, Jean-Claude Andre. On behalf of predominantly Ms. Chen, and I will do my best to save one minute for rebuttal, in my brief time I do want to start off at the same place that Mr. Mammon started off, which is this ripped a family apart, and it wasn't just that it ripped a family apart. It went beyond that. When the city decided to file charges against Mrs. Chen, they also added additional injury, so not just insult injury, but additional injury to this family. And, again, the result is that now the parents are separated. Thankfully, both children have- Why isn't the city insulated by the review by the King County prosecuting attorney who had the 1,000-page medical record, substantial follow-up by Detective D'Amico, an independent review within the prosecutor's office that ultimately led to the decision to charge second-degree child neglect? A couple of responses, Judge Tallman. One, the DA's office only reviewed what law enforcement sent her, meaning that there was no additional investigation conducted by the DA's office. For example, I'm referencing that because that takes this case outside of the McSherry context. But that would not be typical, counsel, in my experience. The prosecuting attorney's office relies almost exclusively on the investigative record, and here they had substantial medical records plus a pretty comprehensive follow-up investigation, a chronological report from Detective D'Amico about all the steps that she took in her follow-up investigation. So, again, as I said, multiple responses to your initial question. An additional one, and also a legalistic one, is that if the state of the record is such that the prosecutor doesn't know that the submission by law enforcement may be fundamentally compromised, then the presumption of individual prosecutorial review- And how was the prosecutor's decision fundamentally compromised? Not the prosecutor's decision being fundamentally compromised, but that the submission from law enforcement might be fundamentally compromised. What's the factual basis for the fundamental compromise? So that goes back to the whole, I guess, the first step of the judicial deception analysis here, which is that Agent Officer D'Amico, whatever we call her, Detective D'Amico, engaged in numerous misstatements and omissions from her submission to the DA's office. Focusing on the first big two, one was that she said that all other causes had been ruled out. Of course, autism was a known possible cause, and while Detective D'Amico referenced that fact that J.L. was autistic, she did not reference the fact that doctors had acknowledged that autism could be a possible cause of what was being observed. Wasn't that all contained in the doctor's treatment notes that the prosecutor, the senior deputy prosecutor said she reviewed in detail? Much of it was, but there was additional information that Detective D'Amico had that she did not provide to the DA's office. For example, she did not disclose to the DA's office that she had an interview with Dr. Green, who was J.L.'s primary autism specialist. She also did not disclose- But they had Dr. Green's treatment records, did they not? They did. Doesn't that disclose his diagnosis of autism? His diagnosis of autism, yes, but not all of his opinions as to how it could be affecting the particular symptoms that J.L. presented with at the hospital on October 23rd. Additionally, Detective D'Amico did not disclose Dr. Badawo's letter about her opinion of the treatment, her opinion of Ms. Chen's parenting, and also the history of treatment with respect to J.L. I guess another legalistic response would be, this, of course, is a claim for judicial deception, meaning it's that the court was deceived, not just the DA's office. What the DA's office submitted to the court was the probable cause statement written by Detective D'Amico. What I think we would expect is that if the DA's office had gone through and said, this probable cause- But the district court said there wasn't, on the judicial deception, there wasn't enough information to rebut this presumption, which I think you or the counsel acknowledge could bar this claim. Why isn't that legitimate? It affects the prosecutors and the judges' situation of what are they seeing. Not enough. I guess I'm not sure. So you're talking about what Judge Robart found? Yes. And that Judge Robart found, well, this court's review is de novo, and we're here urging this court to reverse that determination that the presumption of prosecutorial independence kicked in here, wasn't overcome by the evidence, wasn't overcome by the legal- But you did agree that the presumption could act as a bar, correct? Oh, theoretically, in an appropriate case, absolutely, yes, Judge McKeown. And you do have a minute left. I guess I'll dive into it for just a sec. The other primary thing that Detective D'Amico omitted from or misrepresented in her probable cause statement, of course, was that she said that the Chens were told that J.L. could not have carbs whatsoever, and Detective D'Amico said that was false. Of course, the record is replete with evidence that the family was told that J.L. either could not have yams, Pedialyte, certain intense carbs. There was a specific carbohydrate-restricted diet that he was given by Dr. Green, and none of that was disclosed. And I guess on that last point, I also would note that there were probably about 15 misstatements or omissions by Detective D'Amico in the probable cause statement, and they're in the record. Unfortunately, they're not in the excerpts of the record. If the court looks at docket entry 160-11, and I actually have copies I can give to the clerk at the end of the hearing, it's all laid out there very, very cleanly. This was a case where there were repeated omissions and misstatements by the investigating officer. Then the prosecutor relied predominantly on those. She did do some of her own review, but it was not comprehensive. And as a result, the probable cause statement that had 15 misstatements and omissions. How was it not comprehensive? How was the prosecutor's review not comprehensive? She read the entire file. They staffed the case internally in the child dependency unit of the prosecutor's office with other prosecutors before the charging decision was made. You say that's not comprehensive. She admitted there were some things that she glossed over. There were some things she did not understand. She admitted that there were some things that she relied on Detective D'Amico in communicating with Detective D'Amico about. It was not the kind of fulsome, comprehensive, independent review that we see, for example, in this court's decision of McSherry. In terms of additional record, typically it's a lot easier for us if you have it in the excerpts of record. If you don't, then you can submit a 28-J letter. Of course, we consider the entire record of the court as to be before the court, but that's why we ask for excerpts of record. But rather than doing that with the clerk here, if you want to submit additional excerpts of record, we'll take that under consideration. Thank you, Your Honor. You may proceed. May it please the Court, my name is Joshua Scher, Assistant Attorney General for the State of Washington, representing the State Appellees. Your Honors, this case involves medical professionals who were gravely concerned about the welfare of a three-year-old child, social workers who were performing their jobs pursuant to statutory authority, and a dependency order that was entered after the child's parents had a full and fair opportunity to present evidence in open court proceedings. As a result, summary judgment on the 1983 and state law claims was properly granted in the district court below. I was planning to start with the 1983 issues, but since Your Honors were asking the Appellants' Counsel more about the negligent investigation, I'd like to start there this morning. There is no tort claim for negligent investigation in Washington State, except for a limited common law claim that has been created. That claim exists only when we have an incomplete or biased investigation that results in a harmful placement decision. To analyze that claim, the first place to start is the question of whether there is immunity, and the Desmott case focuses solely on that issue. In fact, it was the single issue before the court, whether the department had immunity in post-placement decisions. What Desmott points out, however, in footnote 12 to that opinion, is that the individual employees are still entitled to immunity under State Code 424-595. They're entitled to immunity unless they've lied or falsified evidence. There is no evidence in the record before this court that that occurred in this case by Ms. Kegel or Ms. Danner in the performance of their duties. Then we get to the question of, well, is the department liable under a gross negligent standard, which is what 424-595 requires? For there, there are two elements for the court to analyze. The first is the question of gross negligence, which under Harper v. State requires at least slight care. Is there slight care? What we can look at in this case is what did Ms. Danner do in preparing a dependency petition to the juvenile court? She communicated with medical providers. She spoke with the police, with staff, and she prepared a petition based on professionals' opinions known at the time. And I would point the court, it's page 359 of the excerpts of record. It's the investigation report that was compiled shortly after the proceedings in this case. That actually has a very good summary of what the state knew at the time the dependency proceedings occurred. And what we had here was a 3-year-old boy who weighed about 26 pounds in the third percentile for his weight, extremely malnourished. Medical providers who, as I said, were gravely concerned about his welfare and who called the police and had him removed not by the state but by the police out of his parents' custody. And the state recognizes it is an important liberty interest to maintain a parent-child relationship. But the state also has an important interest in ensuring the protection of minors who may be at risk. And that is exactly why we have dependency proceedings, for a court to balance those competing interests. And in this case, Commissioner Hillman balanced that interest in favor of the state after an extremely lengthy hearing where Ms. Chen had interpreters available, put on her own witnesses, and had all the information available  And I take it at that stage of the case, the police detective doesn't participate in what are essentially DSHS proceedings? Typically, and I don't have personal experience in the dependency realm, but typically the record that I believe is going to be presented to the court are, as is in this case, the medical professionals, the reporter who is concerned about the conduct that was occurring, and that evidence is going to be put on when it's contested. Some dependencies are not contested. And the parent simply agrees the child is dependent. But my question was, Detective D'Amico wasn't an active participant. She didn't testify at that hearing. Not to my knowledge. She wasn't present at the hearing. Basically, DSHS was doing what it usually does in conducting the dependency proceedings. That is my understanding, Your Honor. Within that, as you mentioned earlier with appellant's counsel, a limited 72-hour window of time. Because of the grave concerns about malnutrition, about failure to thrive, the department acted swiftly to bring the matter before the juvenile court. There was also with D'Amico, I think the police report did indicate that there was at least one doctor that attributed autism as being one of the reasons for the state of the child. How does that figure in? That was brought before the juvenile court. In fact, the autism diagnosis, that competing reason for the weight loss, the extreme weight loss, was in fact presented in live testimony in open court. And Commissioner Hillman weighed that diagnosis against the state's evidence that was presented based on what was known at the time. And as I mentioned, it has to be done without the benefit of hindsight. So under Harper and related case law, we take the slight care question as it exists at the time, what the state knew when it acted. Not the fact that seven or eight months down the road there was some additional information that may have later become known to one or more of the parties. And that really also relates to the question of causation. Because not only does there have to be gross negligence, but in order to have a negligent investigation claim, there also has to be causation. And under case law such as PEPQ from the Washington Court of Appeals, Tyner from the state Supreme Court and its progeny, in order for there to be liability on causation for a negligent investigation claim, the social worker has to fail to provide the court with material information. And in fact, the social worker has to be the only one with the information that was withheld. And that's explicitly stated in Tyner and related case law. And in this case, Ms. Chen and Mr. Lian had access to, and in fact did put on, evidence of their own competing diagnosis. They had access to all the medical records of JL. And there was nothing in the record in this case that shows that the social worker, Ms. Danner and later Ms. Kegel, was the only individual who had certain information that was withheld from the juvenile court, whether in preparation of the dependency or in later reviews that occurred throughout the dependency. And, Your Honors, this dependency succeeded because the purpose of a dependency is, in fact, to reunite a child with their parent. And that is precisely what ended up occurring in this case. Now, it occurred after some time in which the child was actually succeeding in foster care, had gained weight. It sadly bounced and bounced and bounced in foster care, right? I won't comment on whether it's... Seven placements. Seven placements. I mean, maybe it's not bounced, but let's say was placed multiple times in successive care. And I don't believe the record is complete as to the reasons for the successive placements, nor do I believe that that forms the basis of the case in terms of the number of placements or, as Your Honor described it, bouncing around. The ultimate disposition, the reunification of the parent with child, was, in fact, achieved, and J.L. did gain weight. There was an initial fluctuation downward within a few days of a very minor amount, but immediately after that, he began to thrive. He gained weight, and all of the issues that the state was concerned about initially were resolved. And the dependency was ultimately dismissed. And so what we have here in this case, Your Honors, is nothing in the record that shows gross negligence, nothing in the record that shows causation, and the negligent investigation claim fails as a result. Now, I don't have a lot of time on the 1983 issue, but suffice to say, we believe there was either absolute or qualified immunity, and even if we got past immunity, there was no substantive due process violation that shocked the conscience in terms of falsifying information, no procedural due process violation because Ms. Chen and Mr. Leanne had a full and fair opportunity to be heard on their theory of the case. As to the other claims, the negligent infliction and the outrage, I can certainly answer questions on those, but we don't believe that that conduct rises to the level of what case law requires for those state law claims. And most importantly, the plaintiffs in this case never had a standard of care expert to actually say that the department fell below a certain standard of care. And that's actually required for a negligent infliction of emotional distress claim. But even as to gross negligence, there is not a single expert that the plaintiffs put on before the district court to say in a testimonial declaration, this is the standard of care and the department fell below it. And in many of these cases, that's often the case. The plaintiff will put on an expert witness to say, here's what they did wrong and here's why they did it wrong and what violation of policy. And that's simply absent in the record. So we believe, Your Honor, for those reasons, that there was no error in the district court's decision. Summary judgment in favor of the state defendants, appellees should be affirmed. And I will cede the remainder of time to Mr. Reinsche, the city party's counsel. Thank you very much. Thank you. Thank you. May it please the court. Aaron Reinsche for Natalie D'Amico in the city of Redmond. My plan today is I'm going to go right into talking about prosecutorial independence and the allegations of false statements in the certificate of probable cause. Let's make sure I understand what your position is with respect to Detective D'Amico's certification. She asserted, among other things, that, quote, all causes of JL's condition, aside from malnutrition, have been ruled out. And that, are you saying that was true? I am saying that there's no evidence that it was not true. Well, wasn't there, in her own police report, that there were other potential causes and that there was a difference of medical opinion about the causes? So how could she say that it's been ruled out? The statement about causes being ruled out came from the November 5th scan meeting. It's in D'Amico's notes from the meeting. It's also from CPS's notes from the meeting. The plaintiffs have not presented any evidence that this was not said in the November 5th scan meeting. There's no testimony from any witness who says they did not hear this or from Dr. Metz who said he didn't say it. What plaintiffs have pointed to is records from earlier in the hospitalization. The latest record they have pointed to is October 27th, more than a week before the scan meeting. The fact that there are records showing that the doctors were looking into other potential causes on October 27th is not evidence that the doctors did not say on November 5th that all other causes had been ruled out. Okay. Even if there had been some evidence that there was something misleading about that, we get into the materiality factor. Certainly, the- Well, I understand your first response, and I'm anxious to hear what your adversary will say or rebuttal. I don't understand the arguments you made in your papers about lack of materiality and causation and so forth. This was a really strong statement. How could it not or how could it not be at least a jury question that it was a material cause of the subsequent arrest? Well, first of all, this court is very clear that materiality in a judicial deception claim is a legal question for the court, and the court answers that question by correcting the inaccurate information and determining whether the probable cause finding still would have been entered with the correction. If the statement had simply said multiple doctors diagnosed this child as grossly malnourished and suspected that his malnutrition was a cause of most, if not all, of his medical problems, that would have supported a probable cause as ably as the statement that's But I think you're making my point because that statement would not have had the same impact as a flat statement saying they've ruled everything out except malnutrition. Right, but this is a decision for the court to make as to whether this was a Is it a decision for the court, by the way? I thought materiality, which once was viewed as something to be determined by the court, is now largely viewed as something to be determined by the jury. I'm referring to the Smith v. Almoda case by this court in 2011, and that court's It used to be the law, this is a little off the subject, but it used to be the law that in federal criminal cases, materiality was to be determined by the court. The Supreme Court ultimately overruled that and held it was a question for the jury under the Constitution. I don't know if that affects subsequent decisions in this area. I'm not aware of the ruling that It was a little bit off. How do I feel? I would like to address a few other points on that that were made a moment ago. The point about carbohydrates, and I want to correct something that Judge Tallman asked, which was the date that Dr. Green had last seen J.L. It was March of 2013, more than seven months before the events in question. Now, the advice about carbohydrates, what Mr. Andre was referring to, what plaintiffs have referred to over and over again, is the October 2012 dietary advice from Dr. Green. I would dispute the claims of how clear the records are and what that advice was, but it's not material, because in April of 2013, Dr. Green changed his dietary advice, recommended a new diet. That new diet is described in two separate pages in his records, and the only reference to carbohydrates in his description of the diet is his to increase J.L.'s carbohydrate intake. More specifically to something Mr. Andre said, which is that the recommendation was to remove yams from the diet. Yams are specifically mentioned in the April dietary advice as something that he's recommending putting back into the diet. The allegation has also been made that Detective D'Amico omitted certain information from what she provided to the prosecutor. The counsel has pointed to the phone call allegedly had with Dr. Green. Dr. Green does not ever say that he said the things that Mr. Andre is claiming he said in the phone call, and he has never said that he gave any more detail than the very detailed letters that he provided in the records that were given to the prosecutor. To the contrary, what he said was that it was a perfunctory telephone call. The allegation about Dr. Beddow, plaintiffs have not pointed out anything that Dr. Beddow said in the letter that was attached to an email that wasn't forwarded to the prosecutor. He was the naturopath? Dr. Beddow is the naturopath. And then he also provided a letter to the prosecutor? There was a letter from Dr. Beddow's clinic in the materials provided to the prosecutor which said specifically that they were not aware of any abuse. This other letter, which had been submitted in the dependency hearing and was attached to an email that was sent to D'Amico, it outlines some testing that was done on J.L.'s liver, and it doesn't say anything, and the plaintiffs have not pointed to anything that was said in that letter that would be material to what was said, other than the fact that this was yet another doctor that he was being taken to regularly that other doctors didn't know about. I apologize. I'm jumping around a little bit here. On the issue of prosecutorial independence, I want to emphasize one thing, and that is we have the prosecutor's notes that she took while she was evaluating the evidence and deciding whether to file the charge, and what these notes show is expressly the prosecutor knew about every piece of significant information that the plaintiffs are claiming should have been communicated to her. They expressly show, for example, that she knew about J.L.'s reaction to drinking a large quantity of Pedialyte at Children's Hospital. She knew that Dr. Green had recommended special diets, that he had expressed support for the family and for the parents, and that he had urged the dependency court not to necessarily blame the mother for J.L.'s condition. She knew that Dr. Beddow had seen J.L. on October 23rd and had not referred him to emergency care, and she knew that he had an extensive and varied medical history that included autism and gastrointestinal problems. The plaintiff cannot rebut the presumption of prosecutorial independence by claiming that D'Amico should have told the prosecutor about things she already knew about. And unless the court has further questions, I will simply request that the court affirm the summary judgment in favor of Detective D'Amico and the city of Redmond. Thank you. You have about one and a half minutes, so I'll give you two minutes, and you can, because I think that Mr. Andre used up almost all his time. Thank you, Your Honor. I'll be efficient. So a few quick points in rebuttal. Your Honor, just to counter your question about L.L.'s treatment, I would point the court to ER 403, paragraph 6, noting his effects from this conduct. The other thing I would like to point the court to, ER 403, was L.L.'s, the effect on L.L. of this behavior, to answer your question. The prosecutor's memo dismissing charges at ER 494 to 496 I think is important to consider, from the city prosecutor's objective analysis of the evidence, what the failures were. But that is a determination as to whether or not the state can prove its case beyond a reasonable doubt. That's a different question than whether or not there was probable cause to establish the charge in the first place. The legal standard, I'll agree, is different, but the evidentiary points that the memo is pointing to are important to just another highlight for looking through this evidence. But it's a different standard of proof, counsel. It may be the same evidence, but the conclusion is different if we're talking about proof beyond a reasonable doubt. I'm not pointing the arm to that for the reason to drop the charges, but from the summary of the evidence of what was initially said, what was proven or determined to be, I think that highlights what would have been learned in an investigation. And then if I could finally just make the point, I heard Mr. Scher say that this was a success. This was not a success. And, again, whatever you want to conclude on what happened with the initial hearing, it was ten months that this boy was from his parents through six different foster homes. As of November 2013, social worker for the state, David Peterson, said that there was no basis to continue this, conclude there was no basis to continue this. They knew as of November 2013, and yet for nine more months after that, this boy was separated from his parents. This was not a success. This was a tragedy. We submit that the plaintiffs, the appellants here, are entitled to go back and present this argument to court. Thank you. Thank you. Although you've used your time, I'm going to give you one minute, Mr. Andre, for rebuttal. Thank you, Judge McKeown. To answer your question, Judge Rakoff, materiality is a question for the court, at least with respect to the judicial deception claim, and that's because basically it's probable cause once the affidavit or probable cause statement is cleaned up and all the omissions are filled in and misstatements are taken out. So it's just like PC when the court looks at that. Of course, the final claim that we have here on appeal does not depend on the court making any materiality determination or involve a prosecutorial independence issue. That is just a straight deliberate fabrication claim. As to Dr. Green and the misstatement by Detective Amico with respect to carbohydrates, what the record specifically says, excerpt from record page 578, this is Dr. Green's declaration. The inference in defendant's filing seems to be that I changed my recommendation as of April 1, 2013, and took JL off a reduced carbohydrate diet. That is an incorrect inference. Aren't yams carbohydrates? They have some carbohydrates, but I think what he was trying to say is that this was still a doctor-tailored recommendation. It wasn't, oh, carbohydrates are fine, Pedialyte, which is about as heavy. But he's not saying no carbohydrates. That's correct. That's correct. Okay. Finally, I guess the last thing I would just say is, unlike the claim for dependency, here we're talking about what Detective D'Amico did, and there's no urgency. There's no 72-hour concern. Detective D'Amico could have brought her charges whenever the statute of limitations would have expired, and that's one of the reasons why we think that overall she should have been more careful. She shouldn't have made all the misstatements and omissions in her probable cause statement, and for those reasons we believe that Ms. Chen is entitled to relief. Thank you. Thank you. The case just argued. Leon v. D'Amico is submitted, and we're adjourned for the morning.
judges: McKEOWN, TALLMAN, Rakoff